Case No. 19-70008

*In the*

*United States Court of Appeals*

*for the Fifth Circuit*

_____

CHUONG DUONG TONG,

PETITIONER – APPELLANT

v.

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent-Appellee.*

_____

On Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:10-CV-2355

_____

**PETITIONER TONG'S APPELLATE BRIEF**

_____

Jonathan D. Landers
917 Franklin; Suite 300
Houston, TX 77002
Tel: (713) 685-5000
Jlanders.law@gmail.com

Attorney for Petitioner Tong

## CERTIFICATE OF INTERESTED PERSONS

(1) Chuong Duong Tong v. Lorie Davis, Director, Cause no. 19-70008

(2) The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal. No corporate disclosure statement is required in this case.  Fed. R. App. P. 26.1.  No known people have a financial interest in the outcome of this case.   Fifth Cir. R. 28.2.   The Respondent/Appellee is represented by Matthew Dennis Ottoway and Jefferson David Clendenin of the Texas Attorney General's Office.  Appellant was previously represented by Teresa Schneider of the Winstead P.C. law firm during the state and federal habeas proceedings.

/s/ Jonathan Landers

Date: May 24, 2023                      Jonathan Landers

## STATEMENT REGARDING ORAL ARGUMENT

This case involves important procedural and constitutional issues relevant to the treatment of substantial but unexhausted or procedurally defaulted claims of ineffective assistance of counsel in light of the Supreme Court's recent decision in *Shinn v. Ramirez*, 212 L. Ed. 2d 713, 142 S. Ct. 1718 (2022). Oral argument would assist in the decisional process.

T<small>ABLE OF</small> C<small>ONTENTS</small>

Certificate of Interested Persons ....................................................i

Statement Regarding Oral Argument ...................................... ii

Table of Authorities ....................................................................v

Statement of Jurisdiction..............................................................1

Statement of Issues........................................................................1

Statement of the Case and Facts ................................................1

I.      Procedural History ............................................................1

II.     An overview of the Wiggins claim and the application of *Trevino*. ...............6

        A.      Trial ......................................................................6

        B.      Prior counsel failed to discover a tidal wave of mitigating evidence. 10

                1.      Chuong's childhood. ................................................10

                2.      Tong's immigration experience was truly unique. ...................21

                3.      The effect of repeated trauma on Tong's life. ..........................23

                4.      Chuong suffers from Autism Spectrum Disorder....................25

        C.      Trial counsel's minimal mitigation investigation. ...........................27

        D.      Counsel for the initial-review collateral proceedings performed no mitigation investigation.................................................30

        E.      The Wiggins claim presented to the district court. ...........................31

Summary of the Argument .......................................................................... 32

Standard of Review .................................................................................... 33

Argument .................................................................................................... 34

I.    The district court erred by granting the Director's motion to enter
      judgment. ......................................................................................... 34

      A.    The district court abused its discretion by failing to grant Tong's
            motion to stay and abet ......................................................... 35

      B.    Habeas petitioners are constitutionally entitled to effective
            assistance of counsel during initial review collateral proceedings
            which are not discretionary and which present the only
            meaningful opportunity to raise a claim of ineffective assistance of
            trial counsel. ......................................................................... 45

Prayer for Relief ........................................................................................ 53

Certificate of Service ................................................................................ 54

Certificate of Compliance ........................................................................ 54

# TABLE OF AUTHORITIES

**Cases**

*Anders v. California,* 386 U.S. 738 (1967) .................................................................45

*Ayestas v. Davis*, 138 S. Ct. 1080 (2018) ............................................................4,43

*Blake v. Baker*, 745 F.3d 977 (9th Cir. 2014) ...........................................................37

*Brady v. Maryland,* 373 U.S. 83 (1963) .............................................................3, 43

*Butler v. Cain*, 533 F.3d 314 (5th Cir. 2008) ...........................................................33

*Central Va. Community College v. Katz,* 546 U.S. 356 (2006) .............................50

*Coleman v. Thompson*, 501 U.S. 722 (1991) .............................................. 34, 46, 48

*Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980) ...............................................................................................................49

*Douglas v. California*, 372 U.S. 353 (1963) ........................................ 46, 47, 50, 52

*Evitts v. Lucey*, 469 U.S. 387 (1985) ........................................................................50

*Ex parte Alvarez*, 468 S.W.3d 543 (Tex. Crim. App. 2015) ...................................40

*Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007) ........................................42

*Ex parte Buck*, 418 S.W.3d 98 (Tex. Crim. App. 2013) .........................................40

*Ex parte Chuong Duong Tong,* WR-73377-01, 2009 WL 1900372 (Tex. Crim. App. 2009) ......................................................................................................................2

*Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002) ............................... 40, 41

*Ex parte McCarthy*, WR-50,360-04, 2013 WL 3283148 (Tex. Crim. App. June 24, 2013) ...........................................................................................................40

*Ex Parte Medina*, No. WR-41,274-05, 2017 WL 690960, at 9 (Tex. Crim. App. 2017) ...................................................................................................40

*Ex Parte Tong*, WR-71,377-02, 2013 WL 2285455 (Tex. Crim. App. May 22, 2013) ...............................................................................................................2

*Grace v. Vannoy*, 826 F.3d 813 (5th Cir. 2016) .......................................................33

*Guevara-Pontifes v. Baker*, No. 320CV00652ARTCSD, 2022 WL 4448259 (D. Nev. Sept. 23, 2022) ..............................................................................44

*Halbert v. Michigan*, 545 U.S. 605 (2005) ......................................................ⵏ 46, 47

*Irish v. Cain*, No. CV 15-480, 2023 WL 2564397 (W.D. La. Mar. 16, 2023)........42

*Martinez v. Ryan*, 132 S. Ct. 1309 (2012) ....................................................... passim

*Moncada v. Perry*, No. 319CV00231MMDCLB, 2022 WL 3636467 (D. Nev. Aug. 23, 2022) ..................................................................................... 37, 41

*Murray v. Carrier*, 477 U.S. 478 (1986) ...................................................... 36, 49

*Murray v. Giarratano*, 492 U.S. 1 (1989) .................................................... 45-46

*Neville v. Dretke*, 423 F.3d 474 (5th Cir. 2005) ....................................................39

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005) .............................................................36

*Pandeli v. Shinn,* No. CV-17-01657-PHX-JJT, 2022 WL 16855196, at 5 (D. Ariz. Nov. 10, 2022) ...................................................................................44

*Pennsylvania v. Finley,* 481 U.S. 551 (1987) .................................................. 45, 46

*Perez v. Stephens*, 745 F.3d 174 (5th Cir. 2014) .............................................. 33-34

*Rhines v. Webber*, 544 U.S. 269 (2005).................................... 33, 35, 36, 37, 44, 45

vi

*Rose v. Lundy*, 455 U.S. 509 (1982) .......................................................................35

*Ross v. Moffitt*, 417 U.S. 600 (1974) ........................................................ 47, 48, 52

*Shinn v. Martinez Ramirez*, 142 S. Ct. 1718 (2022) ....... 4, 34, 37, 39, 41, 44, 49, 52

*Shinn v. Ramirez*, 212 L. Ed. 2d 713, 142 S. Ct. 1718 (2022)................................. ii

*Strickland v. Washington,* 466 U.S. 668 (1984) ............................................... 31, 38

*Taylor v. Dir. - Nevada Dep't of Corr.*, No. 220CV01962GMNDJA, 2023 WL 2189062, at *4 (D. Nev. Feb. 22, 2023) ...............................................................44

*Tong v. Lumpkin*, 825 Fed. Appx. 181 (5th Cir. 2020)........................................3, 4

*Tong v.  State,* 25 S.W.3d 707 (Tex. Crim. App. 2000) ...........................................2

*Tong v. Texas,* 532 U.S. 1053 (2001) .......................................................................2

*Trevino v. Thaler*, 133 S. Ct. 1911 (2013) ....................................................... passim

*Wiggins v. Smith*, 539 U.S. 510 (2003)............................................................ passim

*Wilder v. Cockrell*, 274 F.3d 255 (5th Cir. 2001) ...................................................42

*WILLIAM K. SAPP, Petitioner, v. CHARLOTTE JENKINS, Warden, Chillicothe Corr. Inst., Respondent.*, No. 2:17-CV-1069, 2023 WL 3475412, at *2 (S.D. Ohio May 16, 2023) .........................................................................................................45

**Statutes**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 2244(d) .........................................................................35

28 U.S.C. § 2253 (a) and (c) .............................................................1

28 U.S.C. § 2254(e)(2)................................................................ 49, 52

Texas Code of Criminal Procedure art. 11.071 sec. 2, 3, 4 (west 2002) .................51

Texas Code of Criminal Procedure art. 11.071 § 5 ......................... 41, 43

Texas Code of Criminal Procedure art. 11.071 § (5)(a) ...........................................42

Texas Code of Criminal Procedure art. 11.071 § 5(a)(3) .......................... 33, 42, 43

Texas Code of Criminal Procedure art. 37.071 ......................................................42

## STATEMENT OF JURISDICTION

This Court has jurisdiction to consider the merits of this appeal pursuant to 28 U.S.C. §§ 1291 and 2253 (a) and (c).  The District Court granted Tong a certificate of appealability on the issues addressed in this brief on March 4, 2023.   ROA.13244.

## STATEMENT OF ISSUES

I.    The district court erred by granting the director's motion to enter judgment.

    A.    The district court abused its discretion by failing to grant Tong's motion to stay and abet.

    B.    Habeas petitioners are constitutionally entitled to effective assistance of counsel during initial review collateral proceedings which are not discretionary and which present the only meaningful opportunity to raise a claim of ineffective assistance of trial counsel.

## STATEMENT OF THE CASE AND FACTS

## I.    PROCEDURAL HISTORY

Petitioner Tong was convicted and sentenced to death in the 178th District Court of Harris County on March 11, 1998. ROA.6578.[1]    His direct appeal was

---

[1] In this brief a citation to the "CR" refers to the Clerk's Record (the pleadings and documents filed in the trial court.) "RR" refers to the Reporter's Record (the transcribed statement of facts and exhibits introduced at trial.).

denied on April 12, 2000. *Tong v. State,* 25 S.W.3d 707, 717-18 (Tex. Crim. App. 2000). The United States Supreme Court denied Tong's request for writ of certiorari on May 29, 2001. *Tong v. Texas,* 532 U.S. 1053 (2001).

Tong's state habeas application was timely filed on October 10, 2000, and the state trial court recommended denying all relief on November 10, 2008. ROA.11015-11066. The Texas Court of Criminal Appeals denied the application on July 1, 2009. *Ex parte Chuong Duong Tong,* WR-73377-01, 2009 WL 1900372 (Tex. Crim. App. 2009) (unpublished).

Tong's federal habeas petition was timely filed on July 1, 2010. ROA.37. The petition was amended on September 13, 2011. ROA.342. After extensive briefing by both parties, the District Court entered an order staying further proceedings and permitting Tong to file a subsequent state application for habeas corpus. ROA.1461. On November 28, 2012, Tong filed his subsequent state application for writ of habeas corpus in the 178th District Court of Harris County. On May 22, 2013, the Court of Criminal Appeals dismissed Tong's subsequent writ as an abuse of the writ. *Ex Parte Tong*, WR-71,377-02, 2013 WL 2285455 (Tex. Crim. App. May 22, 2013).

Upon returning to federal court, Tong's previous attorney filed a motion requesting that additional counsel be appointed to assess or raise any possible

ineffectiveness claims which might excuse potential procedural defaults in the current litigation in light of *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).  ROA.1482. As a result, the District Court relieved previous counsel and appointed undersigned counsel.  ROA.1509, 1519.

Tong then filed a motion for funding to hire a mitigation expert and qualified Vietnamese interpreter noting that previous counsel had not raised a *Wiggins*[2] claim in his initial state habeas proceedings, but had raised a *Wiggins* claim in the federal petition.  ROA.1548.  That request was denied by the District Court.  ROA.1625. Tong renewed his funding request in additional briefings, but was not provided funding for a mitigation investigation. ROA.1786, 1824, 2737.[3]

On September 30, 2016, the District Court denied relief on the majority of Tong's claims (including his *Wiggins* claim), granted COA related to two issues, and ordered a hearing be held on *Brady* claims.  ROA.2480-2981.  After a two-day hearing and multiple rounds of discovery, the District Court denied Tong's *Brady* claims on March 22, 2019.  11815-11840.

---

[2] Claims that "trial counsel were ineffective for failing to investigate and present mitigating evidence" are sometimes called "*Wiggins* claim[s]," *Tong*, 825 F. App'x at 182–83, after the Supreme Court case *Wiggins v. Smith*, 539 U.S. 510 (2003), addressing the same issue.

[3] Attorney Jade Ortego was employed (at a discounted rate) by counsel to perform some investigation into the *Wiggins* claim.  ROA/1821.  The District Court did reimburse counsel for Ms. Ortego's role in this case.

3

On appeal, this Court vacated the district court's ruling on Tong's funding request, and remanded the case for reconsideration of the previous funding request in light of *Ayestas v. Davis*, 138 S. Ct. 1080 (2018). *See Tong v. Lumpkin*, 825 Fed. Appx. 181, 183 (5th Cir. 2020). The Court explained that "remand is appropriate to ensure an accurate and efficient resolution of Tong's *Wiggins* claim." *Id*. at 186. On remand, the district court granted Tong's funding request. ROA.12071-12076. After the grant of funding, Tong moved in this Court to stay further proceedings and remand the case for full briefing and development of the *Wiggins* claim. This Court remanded in an order which vacated the "previous order denying a COA on Tong's *Wiggins* claim." ROA.12093-12094. The remand was specifically for the district court to further develop the Wiggins claim. *Id*.

During the remanded proceedings, the Director filed a motion to enter judgment and terminate the remand on account of intervening Supreme Court Precedent, specifically *Shinn v. Martinez Ramirez*, 142 S. Ct. 1718, 1735 (2022). ROA.12251-12262. Tong opposed this request, and both parties briefed the issues raised in this brief. ROA.12264-12297. Prior to any ruling by the district court, Tong filed his Amended *Wiggins* Briefing, supported by hundreds of pages of documents, showing that his trial counsel and initial collateral review counsel failed to discover and present a tidal wave of mitigating evidence. ROA.12288-12824. He

also filed a motion to stay the proceedings so that he could return to state court and exhaust his *Wiggins* claim.  ROA.12825-12838.  The Director opposed the motion.  ROA.12841-12854.  The Director later filed a motion for summary judgment on the claim.  ROA.12876-12938.

After full briefing on the *Wiggins* claim, the district court granted the Director's motion to enter judgment based on the Supreme Court's decision in *Martinez Ramirez*.  ROA.13238-13244.  The court discussed Tong's motion for a stay and abeyance and his argument that the constitution required effective assistance of counsel in during initial review collateral proceedings in this particular circumstance.  *Id.*[4]  The court recognized that Tong presented "a serious claim that he received ineffective during the punishment phase of his trial," but granted the Director's motion to end the remand.  However, the district court granted a certificate of appealability.  ROA.13244.  The court entered a final judgment dismissing Tong's claims and terminating all motions.  ROA.13245.  Tong timely filed his notice of appeal.  ROA.13246.

---

[4] In addition to his motion to say the proceedings, Tong briefed the both the propriety of the stay and abeyance and the constitutional issue in his reply to the director's motion to enter judgment and his is reply to the respondent's motion for summary judgment.  *See* ROA.12269-12285, 13203-13215.

## II.    AN OVERVIEW OF THE *WIGGINS* CLAIM AND THE APPLICATION OF *TREVINO*.[5]

Tong's trial counsel failed to live up to the prevailing professional norms at trial because they failed to sufficiently investigate the mitigation case, and this error deprived the jury of a tidal wave of mitigating evidence. The result of trial counsel's error is that the jury never learned that Tong's short life prior to his death sentence was one of constant abandonment, sexual and physical abuse, and neglect. The jury also never learned that he suffers from Autism Spectrum Disorder, or how this diagnosis, when combined with the effects of trauma, both helped to explain his life direction, behavior prior to incarceration, and chances of a peaceful life in prison. Further, Tong's post-conviction counsel failed to investigate the mitigation case, contravening the professional norms in place during his initial-review collateral proceedings.

### A.    Trial

The guilt-phase evidence showed that on April 6, 1997, Tong shot and killed Houston police officer Tony Trinh during a robbery of Sunny's, a convenience store owned by Trinh's parents. ROA.2904-2905. In his custodial confession, Tong confessed to accidentally shooting Trinh, and later showed the police where he

---

[5] The citations in this section of the brief are to the factual briefing in Tong's Amended *Wiggins* Briefing. The factual basis of the claims were supported by documentary evidence presented to the district court, as cited in the relevant pages of record on appeal.

disposed of handgun components. *Id.* While in a holding cell, he explained how he shot Trinh, showed no remorse, and mimed shooting another officer who was placing him in leg restraints. *Id.* at 2905-2906. At trial, Tong presented an alibi defense and claimed he had been coerced into confessing. *Id.* He was convicted of capital murder.

The district court adequately described the prosecution's punishment evidence:

> During the penalty phase, the State presented evidence that Tong was arrested for stealing, and had numerous disciplinary problems, during high school. Efforts to counsel Tong were unsuccessful due to Tong's lack of remorse. He got in trouble for theft, destruction of property, sexual harassment, and assault. He was eventually expelled from school due to concerns that he posed a threat to the safety of other students. 19 Tr. at 59-83.

> During the penalty phase, the State also presented evidence of other incidents. The first was that, about a month after the murder, Tong took part in a bank larceny involving $400,000. *Id.* at 92-118. Also, two days before the Trinh incident, Tong and an accomplice broke into the home of Vincent and Hannah Lee. Mrs. Lee was at home with her sick toddler, Christina. Tong tied Mrs. Lee up, put a gun to her head, and told her he was going to take all of her money and then kill her. Mr. Lee came home during the robbery. When Mr. Lee came home Tong's accomplice heard Mr. Lee enter and told Mrs. Lee that they would kill her if she made any noise. Tong approached Mr. Lee with a gun. When Mr. Lee reached for the gun, Tong shot him. Tong dragged Mr. Lee into the living room, where Mrs. Lee and Christina were held, threw him to the floor, and threatened to kill him. As he was leaving, Tong stated that he was "going to kill all of you" and began firing toward the family.

He shot Christina in the leg, and hit Mr. Lee with two more shots. Tong laughed after shooting the Lees and left. 19 Tr. at 237-58.

ROA.2906-2907.

The mitigation case spanned 85 pages of testimony. 20 RR at 18-103. No experts were called to testify on Tong's behalf. *Id.* The defense called Hoang Tong, Tong's biological father, to testify about his son's life. 20 RR at 18-36. He testified that Tong's mother had abandoned the family prior to Hoang and Tong escaping Vietnam by boat when Tong was three. *Id.* at 18-22. He briefly discussed their travels prior to ending up in Germany, and that Tong missed his mother. *Id.* at 22-26. His testimony omitted that he had consistently abandoned Tong throughout his life, was abusive and neglectful, or that he had almost no involvement with Tong once Tong arrived in the United States.

Mike Tong, Tong's uncle, testified that Tong was sad when he arrived in Houston, and that he was unable to communicate with family because he did not speak Vietnamese or English. 20 RR at 37-43. Ly Phan, Tong's grandma, spoke about the large number of people who lived in the house with Tong and his extended family in Houston, and thought Tong was sad because he had no immigration papers and could not go to college. *Id.* at 45-49. A pastor of a downtown Houston church

testified that Tong had been enrolled in CC classes and served in Sunday mass eight years prior. *Id.* at 50-52.

The only in-depth mitigation evidence came from Tong's foster parent from Germany, Jim Wyatt. Wyatt discussed Tong's childhood for the three years he lived with the Wyatts in Germany, which lasted until Tong was about eight years old. *Id.* at 54-102. Tong was living in a Red Cross home with his dad and many other people when he first arrived in Germany. *Id.* at 54-62. His father never provided a stable home environment, and would just sit around watching violent movies and pornography with his friends. *Id.* at 62-70. Tong was taken in by a foster family, but was abandoned by them when the family started having internal problems. *Id.* He was sent to an orphanage. *Id.* He then moved in with the Wyatts as they were having their first child. *Id.*

Tong was a loving brother, but when he seemed troubled when he returned from visits with his dad. *Id.* at 70-80. His dad was a strict disciplinarian. *Id.* Eventually, his dad left for a vacation to Houston, and never came back. Tong started having problems. He would throw fits and sometimes became uncontrollable. *Id.* A psychiatrist was sought out, but did not help. *Id.* at 80-90. Eventually, Jim Wyatt brought Tong to the United States to live with his dad. Mr. Wyatt was the defense's main mitigation witness, but he lacked any details about

life in America after the age of eight.  This allowed the prosecution to easily dismiss the mitigation case.

The prosecution argued that mitigation evidence was limited to that which "reduces moral blameworthiness[,]" and argued "none of that evidence that you've heard on special issue number two reduces his moral blameworthiness . . ."  20 RR at 111, 123.  The prosecution's main argument was that Tong had a large and caring support system throughout his childhood, but that he simply refused help and support.  *Id.* at 118, 123-125.  The prosecution argued there were no mitigating circumstances in Tong's case.  *Id.* at 158.  We now know that Tong lacked any semblance of a support system, was physically and sexually abused, and that his mental health issues likely contributed to his social adaptation problems.

### B.    Prior counsel failed to discover a tidal wave of mitigating evidence.

### 1.    Chuong's childhood.

Tong was born into a poor Vietnamese family during the communist revolution.  *Id.* at 12308-12309.  His mother worked in the rice fields and his father's family raised pigs, but neither parent had steady income.  *Id.*  Chuong's family was so poor that his mother would search food in trash, and his mother and father often fought about his father's work ethic and perpetual drunkenness.  ROA.12310. Tong's mother, who was a teenager, would take her frustrations out on Tong.  *Id.*

10

At an early age, Tong's mental health issues appeared. He had trouble talking and could not form words properly. He could not remember what his mother told him. One day, his uncle, Chanh, saw him floating down the river face down. Luckily Tong was pulled from the river still alive but unconscious. No one seemed to care that he almost died. ROA.12310-12311.

During this time Tong's dad, Hoang, was repeatedly trying to escape from Vietnam. His modus operandi was to take one of his children along, with hopes that he would end up in the United States if he was saved at sea. In 1979, Hoang took Chuong and successfully escaped Vietnam. However, he never told Tong's mother where he was going, instead he claimed he was taking Chuong to visit his parents in Saigon. Chuong would never see his mother again. ROA.2311-12312.

Chuong, his uncle, and his father left Vietnam in a leaky boat unfit for the voyage. The voyage was dangerous, the refugees had to constantly be aware of communists or pirates. There were 42 people on the small boat, and Chuong was one of only two or three children. The boat smelled of blood, vomit, and feces. The family was at sea for two or three days before being rescued by a German ship called the Cap Anamur on September 19, 1980. As the rescue boat approached, the small boat Chuong was on capsized, as captured in photos the defense team failed to discover. ROA.12312-12314.

11



Journalists accompanied the rescue operations and used dramatic pictures and reports to advertise the actions of the "Cap Anamur" (from: stern, October 16, 1980, pp. 20-29, here pp. 22f .; photo: Klaus Meyer-Andersen)  6

The rescue boat took the refugees to a camp in Palawan, Philippines, where Hoang, Chuong, and Viet stayed for six months.  During this time there was little food, no formal housing, and no water supply.  The refugees made shacks out of whatever supplies they could scavenge, and Choung was known for visiting other people's shacks searching for food.  Eventually, Chuong was left unsupervised because his father and uncle were required to study English.  ROA-12314-12315.

---

[6] Photo in Stern Magazine dated October 16, 1980.  Hoang and Chuong can be seen on the very left, Chuong holding onto his father who is about to jump or fall into the water.

After six months, Hoang, Viet, and Chuong were brought to the Philippine Refugee Processing Center (PRPC) in Bataan where Chuong and his father stayed for three months. This camp was better organized and Hoang would spend his time taking English classes. Chuong would spend the day with other people and when he got hungry would go from house to house asking people for food. Everyone just let the kids walk around and play. Tong, his dad, and uncle were sent to Germany after nine months. ROA.12316.

In Germany, Tong would suffer repeated abandonment from those who were supposed to be caring for him. In the winter of 1981, Chuong and Hoang arrived in Berlin and lived in a three-story government housing building along with other Vietnamese refugees. Hoang initially took classes during the day, but soon began working in a chocolate factory and moved into an apartment by himself. ROA.12317-12318.

Chuong's father no longer had an interest in him now that he had achieved his purpose of escaping Vietnam. If authorities could not find him a foster family, then he would be sent to the orphanage "Fuchsbau." Ulrike Derfert was a social worker at the German Red Cross who met Chuong in 1981, when he was five years old. One day during Ulrike's internship, one of her supervisors asked her if she wanted to take Chuong in as a foster child. She had a child Chuong's age, and after speaking with

her husband decided to take him in.  *Id.*  Ulrike remembers Hoang telling her several times that it would have been better if he could have taken his younger son instead of Chuong.

Things did not go well.  In preschool Chuong did not play well with other children and had problems following the rules.  At home, there were problems as well.  Chuong had episodes when he would break anything he could get his hands on. Chuong seemed to need 100% attention all the time, and was unable to complete simple tasks like painting and board games. The things other children did were impossible with Chuong.  There were other signs of mental illness.  Choung was unable to concentrate, would wake up during the night with nightmares, and would cry for hours on end.  Eventually, he was removed from preschool.  After six weeks Ulrike and her family stopped fostering Chuong.  ROA.12318-19.

Psychologist Barbara Hamm explains that Chuong's actions during this time were a sign of intense psychological pressures.  She opines that "we can clearly see that Chuong was in terrible distress."  Unable to communicate his distress he lashed out and cried constantly.  ROA.12319-20.

Chuong was sent back to the orphanage, but Ulrike would keep up with his life.  He still visited Hoang on the weekends, and sometimes Ulrike would visit with

Chuong and his father. Chuong would sit with his father and other young men as they drank and watched violent movies and pornography. When Chuong cried too much for Hoang, Hoang would put a cigarette pack in his mouth and beat him. As a result, Ulrike no longer let her daughter visit with Chuong. Dr. Hamm explains that "[t]his would lead to feelings of hopelessness and despair as he grew older. As a child it felt like an indelible sadness that he was such a burden to his father. Any longing for closeness would be interpreted by his father as his inadequacy and cause him to lash out or to shut down." ROA.12320-21.

In 1982, Gabriele Wyatt was working for the Red Cross and was teaching English Language classes to Vietnamese refugees including Hoang. This is how she met Chuong, and discovered that he was living in an orphanage. The Wyatt's, who were about to have their own child, applied to Youth Services and Chuong moved in with the Wyatts in August of 1983. Chuong would still visit his father on the weekends, and when he came back from visiting he was upset and screaming. After these visits Chuong would recoil when Gabriele tried to touch him. ROA.12321-22.

The Wyatts also noticed that Chuong was falling behind developmentally. He wet the bed as a six-year-old, had problems recognizing the personal space of others, and did not talk much. He was, however, inventive and loved and protected his little brother Timmy. The Wyatts would sometimes visit Hoang for dinner, and learned

of how he would punish Chuong. If Chuong would talk back or did anything else his father didn't like, Hoang would put him in a corner of a room with his arms crossed and his face to the wall. If Chuong spoke out, Hoang would put a pack of cigarettes in his mouth to keep him quiet. Hoang would also tell Chuong that his younger brother, who was left in Vietnam, was much better than him. ROA.12323.

Chuong was intelligent, but didn't develop socially. During the first through third grades, there were problems at school: conflicts with children, exaggerated reactions, not participating, and not cooperating. With time, however, Chuong improved, but he lacked perseverance and the attention to detail. Chuong required much special care, and would otherwise attempt to get attention by disrupting the class. ROA.12323-24.

Meanwhile, Hoang was attempting to move to America, but was repeatedly denied for a tourist visa for both Tong and himself. So, he decided to leave by himself. Hoang was granted a tourist visa for himself, and in the summer of 1985, he left Germany without Chuong. He did not tell the Wyatts he was not coming back, they figured that out when he did not return after a month. *Id.* This is when Chuong's behavior worsened. He would defy the Wyatts, he did not listen, did not do as he was told, did not complete his homework. Often, he could not be calmed. Chuong was being bullied at school and was unable to make friends. The Wyatts

sought out a counselor and social worker, but things got worse. At the same time, in November of 1985, a Court judge in Berlin officially terminated all parental care because "parents are not in Berlin" and appointed the Wilmersdorf Youth Welfare Office as Chuong's guardian. The Youth Welfare Office informed the Wyatts of this in December 1985. ROA.12324-25. Dr. Hamm explains that Chuong's deterioration during this time was a result of, and mirrored that of, the first time he was abandoned by his father in Germany. ROA.12325.

When Chuong was 9 years old, the Wyatts decided they could no longer care for him, and gave him the option of returning to the orphanage, going to another foster family, or trying to live with his father in America. Tong picked the latter, and his father agreed to take him back. Jim Wyatt, who is an American citizen, brought Chuong to America to be reunited with his father. Amazingly, Chuong arrived with no nationality, he had only a German ID-card for children. Once Chuong arrived in the US, he could not return to Germany because he had no valid legal status. ROA.12326-27.

At the age of ten, Chuong had lost his mother, two sets of foster parents, and been twice abandoned by his dad. He was reunited with his dad in Houston, but his dad had no plans for Chuong in his life. When Hoang moved to Houston, he moved in with his sister, Michelle. In 1986, when Chuong came to Houston, he also moved

17

in with Michelle, but his father was rarely around.  Chuong, who spoke only German, would follow his cousins around but none could understand what he was saying. ROA.12327.

By 1990, Chuong could speak English, and the conditions in Michelle's house became very crowded.  At one point, 18 people lived in her four-bedroom house. Chuong would sleep wherever there was space, sometimes he would sleep on the couch, in the corner of the living room, or in someone else's bedroom. Around 1991 or 1992, Hoang moved into his own apartment because he wanted to be independent and needed privacy to be with his girlfriends. He did not allow Chuong to come with him.  Indeed, Hoang remained distant from Chuong throughout his time in Houston, he mostly stayed drunk and focused on his own social life.  The family members who lived with Tong during this time remember him as a lonely outcast who didn't belong.  He was often seen sitting by himself, and didn't talk much.  He was, however, clever, and enjoyed figuring out how various toys or appliances worked. Chuong was also kind, and would sometimes offer emotional support to family members.  ROA.1328-30.

Chuong was subjected to both physical and sexual abuse in Michelle's house. Since Michelle and the other adults were working all the time, she designated her oldest son Quyen as the one to discipline the younger children.  Chuong got the worst

18

of it, and cousin Mike heard Quyen screaming at the young boy. Cousin John recalls Quyen beating and punishing Chuong for asking questions. Quyen would make him lay on the ground and then beat him with various objects such as a belt, a tree branch, or a broom handle. But he also got beaten with electrical cords and bamboo sticks. John remembers Quyen beating Chuong so badly that Chuong was bleeding and had welts all over his body. Even though cousins John, Sang, and Qui also got beaten by Quyen, Chuong got beaten the hardest and most often. ROA.12330-31.

Worse than the physical abuse was that Tong's family allowed one of Michelle's employees, Loi, to openly sexually abuse Chuong and others. Loi, Michelle's male employee and the one living in the garage apartment in Michelle's house, began sexually abusing Chuong almost as soon as Chuong started living with Michelle. Loi also sexually abused Michelle's sons John and Sang. Loi would grab their penises and started playing with it. Loi would also often ask Chuong if he could see his penis. Loi did this out in the open for everyone to see. No one in the family said anything about. They just pretended they didn't see it and didn't know about it. Sang witnessed Loi make Chuong give him oral sex. Sang remembers that when the adults came home from work, Chuong would be defensive, brace himself, and cover his genitals, like someone was about to hit him or molest him. ROA.12331-32.

Loi would take John and Chuong out fishing, and would do them favors sometimes. John now realizes this was basically bribery, or a way of luring them. The sexual abuse lasted for a couple years, until Loi moved out of the house. Loi would continue to touch Chuong and John until they were in middle school. Loi was in his mid-twenties when John was twelve and Chuong fourteen years old. Loi also kidnapped Chuong's relative Linh at gun point in front of Chuong and the family. ROA.12332-33.[7]

It was against this backdrop of abuse and violence that Chuong fell in with the wrong crowd. Until the age of 15, he worked in the family butcher shop every day, but this changed when he met Joseph Goins at Memorial High School. He started having problems in school as he spent more time with Joseph and another boy named Joey (who was eventually murdered). During this time, Jean Baker, Joseph's mom got to know Chuong well. She thought he was funny, caring, quiet and private. Chuong told her that his own mother was dead, and spoke of how much he missed her. She believed that Chuong's own family thought of him as nuisance, and remembered that Chuong was a very sad and lonely kid. She believed him an outcast who had no one to care for him. Around this time Chuong was living with

---

[7] This was not the only criminal violence Chuong witnessed in his adolescence. When he was 15, his grandparents house was robbed at gunpoint while he was getting a haircut. ROA.12333.

his grandparents, but their house burned down and he moved in with friends. Within a few years he committed the murder of Officer Trinh. ROA12333-35.

### 2. Tong's immigration experience was truly unique.

One of the prosecution themes in closing arguments was that Tong's life was no different than other immigrants who "overcame some adversity and became productive, except for one, and he is sitting before you." 20 RR at 124. In reality, Tong's journey to Houston was truly unique.

Professor Eric Tang is the Director of the Center for Asian American Studies, at the University of Texas and has "published extensively on the topic of Southeast Asian refugee resettlement to the United States." He explains that "[f]ew, if any, Vietnamese refugee sojourns to the United States exhibit anomalies as remarkable as those experienced by Chuong Tong. In almost every aspect— historical, sociological, political—Chuong's resettlement ran counter to the normative patterns of other refugees who arrived to the United States in the aftermath of the Vietnam." ROA.12335.

Because Chuong was completely undocumented, he was not eligible to the "the range of support" offered to other refugees, including assistance with "housing; English instruction; educational and job programs; job placement." Chuong's status

21

was rare because, "[t]he notion of an undocumented Vietnamese refugee simply did not exist." ROA.12336. Professor Tang believes it "remarkable that Mr. Tong has remained an undocumented immigrant in the United States since his arrival here in 1986." It is also unique that Chuong lacked any clear guardianship, and that no "responsible adult or state welfare agency took clear custodianship of him. . ." *Id.* Professor Tang explains: "I can think of no comparable case in which a Vietnamese refugee child was rendered undocumented, stateless and uncared for by a parent or guardian." *Id.*

Reviewing documents provided by the appointed mitigation investigator, Professor Tang explained how Chuong ended up a kid with no nation. The Wyatts brought him to the United States without valid papers, but his entry papers claim he was a citizen of West Germany. This was false. Chuong was neither Vietnamese nor German, and it is unclear that the Wyatt's lawfully took Chuong from Germany because "Chuong was a ward of the German state." ROA.12337. Chuong's status as an undocumented immigrant "profoundly diminished his social, economic and educational opportunities in this country." *Id.*

Although the prosecution claimed that the Wyatts were part of Chuong's strong support system, in reality "the Wyatts took away Chuong's ability to seek future support and relief from Germany. In other words, once Chuong was taken

22

outside of Germany without status, the German state was no longer obliged to recognize Chuong as its subject." The adults in Chuong's life, those the prosecution claim were his support system, "subjected Chuong to a life of non-recognition by the United States, Germany and Vietnam." Interestingly, the German government also failed Chuong. Instead of doing "something to establish Chuong's right to return to Germany . . . Germany moved to cut ties with Chuong." That government drew the conclusion that he was healthy and cared for in Houston, while in reality was chronically abused. ROA.12338.

Professor Tang concludes that "Chuong, an undocumented and stateless person living in the United States, was treated recklessly by the adults in his life, and neglectfully by state agencies. These parties left him vulnerable to abuse, as well as to the multiple social, economic and political dangers he faced as an undocumented and stateless subject." ROA.12339.

### 3.    The effect of repeated trauma on Tong's life.

Barbara Hamm is a clinical psychologist who has a Harvard Medical School academic appointment in the Department of Psychiatry, worked for the Victims of Violence program, The Massachusetts Marathon Bombing Resiliency Center, and has held various other tenures related to the treatment of trauma victims. ROA.12339. She explains that children like Tong, who suffer from neglect, react

23

poorly to situations by "rely[ing] upon poorly developed problem-solving skills that don't anticipate consequences." She explains these children are also "targeted for abuse", "take the brunt of verbal and physical abuse in their home", and either "fall through the cracks" or are identified as "the cracks" in institutions and in society." ROA.12339-40.

Dr. Hamm notes, when discussing Chuong's abuse in Houston, that this type of "psychological assault has the capacity to change us, in ways both fundamental and subtle by changing the basic systems of the self that underlie our functioning: namely our biological, emotional, and cognitive systems." *Id.* Childhood trauma, left untreated, "may lead to avoidant responses such as withdrawal and denial or active responses such as aggression and rage." The results of trauma are not "an inherent part of an individual's personality, rather than the pathological outcome of exposure to damaging life." ROA.12340-41. Tong's behavioral problems while living with Ulrike, after his father fled to America, and his gravitation toward anti-social behavior all can be explained by the severe trauma suffered in his childhood. ROA.12341-43.[8]

---

[8] In her session with Chuong, he came recounted yet another sexual assault at the hands of a different family member. He was raped by another uncle, at the age of 12 or 13, while sleeping in a garage. ROA.12342.

Importantly, Chuong's life of suffering "is the backdrop for Chuong's educational experience in Houston and for his gravitation to anti-social and criminal activity." His behavior in school, used against him at trial, "is a downward spiral that includes substance abuse and anti-social and often criminal activity. These are well documented patterns of behavior of traumatized children and teens." *Id.* At the time of Tong's trial, "[t]he field of psychological trauma was burgeoning, and much research focused on the role of negative experience, toxic stress, and the consequences of childhood trauma … Drug use and anti-social behaviors were recognized as, though maladaptive, coping strategies." ROA.12342-43.

In short, Dr. Hamm explained that Tong's background of severe abuse and neglect made his "segue [into drugs use and crime] sadly, predictable." Dr. Hamm's assistance showed that the prosecution's treatment of Tong's punishment case was simply wrong. He did not simply pick a life of crime at his young age, instead, the constant neglect, abuse, and violence he lived through during his childhood all but ensured his place in the world.

### 4.     Chuong suffers from Autism Spectrum Disorder.

Had prior counsel fully investigated the mitigation case then they could have rebutted the prosecution themes that Tong was leader in criminal behavior, that there

25

was no causal connection for his criminal actions, and that there was no evidence reducing his moral culpability.

Dr. Diane Mosnik is a licensed Clinical Neuropsychologist, Pediatric & Adult & Forensic Psychologist. Her clinical examination revealed a diagnosis of Autism Spectrum Disorder[9] as well as posttraumatic stress disorder.  Her testing results reveal the Tong is at a higher risk of being led into criminal activity, had a high level of suggestibility, and exhibited severe social deficits.  The diagnosis helps to explain Tong's behavioral problems at school, rebuts the idea that he was a leader in criminal activity, and, when combined with the facts of his childhood, greatly increased the likelihood that he would be led astray.  ROA.12345-46.

Importantly, the diagnosis of Autism Spectrum Disorder not only effects the mitigation case, but also would have minimized the threat of future dangerousness if Tong were sentenced to life in prison.  This is because "[r]esearch in the field of Autism has demonstrated that individuals diagnosed with an Autism Spectrum Disorder can, and do, continue to learn complex social skills throughout adulthood."

---

[9] This same diagnosis was available at the time of Tong's trial, although it was found under "the grouping of Pervasive Developmental Disorders" in the DSM-IV published in 1994. *Id.* at 12-13.

This opinion has been proven by Tong's extemporary behavior for the last 20 years in prison. ROA. 12346-47.

Dr. Mosnik also explained that the body of research into "the field of Autism Spectrum Disorders was readily available to medical professionals during the time of Mr. Tong's legal proceedings discussing the diagnosis of Autism Spectrum Disorders." ROA.12347-48. She further believes that the defense team's neuropsychologist failed to diagnose Tong because he was "was not provided enough information about Mr. Tong's social and emotional behavior to make a diagnosis of an Autism Spectrum Disorder." ROA.12348.

### C.    Trial counsel's minimal mitigation investigation.[10]

Records gathered from the Harris County Clerk's Office show that the defense did hire experts (none of whom testified at trial). However, the records also establish a minimal factual investigation. The invoice submitted by Sebesta Investigation shows that Sebesta's role in the defense was working on guilt innocence issues, filing subpoenas, and reviewing records to locate Tong's past teachers. It does not appear that Sebesta spent time working on the mitigation case or speaking with Tong's family, other than possibly attempting to speak with Tong's teachers. He first

---

[10] Voir dire in this case began on February 16, 1998. *See* Reporter Record vol. 3.

attempted to contact teachers six days prior to trial. *Id.* A "teacher list" was provided to trial counsel Allen Tanner on March 17, 1998, after the trial had concluded. ROA.12349-50.

The records show that investigator Patterson was assigned to the mitigation case. She spoke with only four members of Tong's family. She first interviewed Michelle Tong on February 9, 1998, and she did not interview Que Chauh or perform her follow up interview on Michelle Tong until March 9, 1998, which was the first day of the punishment proceedings. Patterson spent a total of 7 hours interviewing these family members. *Id.* This is the extent of the mitigation investigation into Chuong's life in Houston, despite evidence showing that the defense team knew Chuong lived with over a dozen relatives, that he was taunted by family members, and that Tong reported abuse by his cousin Quyen. The entire mitigation investigation, including preparing records, serving subpoenas, and making arrangements for meetings was performed over 27 ½ hours. ROA.12350-12352.

Certain facts discovered by the defense team would have led any competent counsel to dig farther. A mitigation report shows the defense knew that Tong had escaped Vietnam by boat, but did not attempt to discover any evidence surrounding the escape or call an expert who could explain what such "boat people" endured on the high seas. The defense team didn't attempt to discover any records related to the

28

Tong's rescue at sea or his stay in immigrant camps.  The defense also failed to investigate Tong's life Vietnam, and other than calling witness Jim Wyatt, failed to further investigate Tong's life in Germany.  ROA.12351.

Clerk's records also show that the defense team hired certain experts.  Dr. Yohman conducted testing on Tong on January 9, 1998, but records also show that he did not have educational records or a biographical history to guide his testing at time.  Dee Dee Halpin prepared a report on March 2, 1998, after the completion of voir dire and two days before the start of testimony.  She opined that Tong's failures in school "must have come from other social or emotional issues not indicated in his school records."  This information might have assisted Dr. Yohman, had her report existed when Yohman performed his work.  The defense also hired Dr. Paul Leung an expert on the "Vietnamese immigrant experience in the United States."  But Dr. Leung apparently discussed other violent crimes committed with Tong, and could not be called as a witness.  Dr. Leung's work took place over two days, one of which was during voir dire, and his expense records show he spent around 20 hours in Houston.  Part of that time was spent watching a movie in his hotel room. ROA.12352-54.

**D.    Counsel for the initial-review collateral proceedings performed no mitigation investigation.**

Texas Attorney Jade Ortego reviewed the files of prior post-conviction counsel looking for any proof that they performed an independent mitigation investigation, and her affidavit establishes that no independent investigation was performed.  Ms. Ortego's review of prior counsel's file shows that the law firm representing Tong considered performing an investigation, and that at least two attorneys were assigned to the mitigation case.  And, Tong and his counsel discussed the "importance of traumatic incidences of his childhood."  ROA.12355-56.

However, other records prove that no mitigation investigation took place.  A letter from counsel McFarland explained to Tong that "[u]nlike Wiggins, however, significant research into your background was developed and presented at trial."  Another memo shows that counsel reviewed the sparse mitigation file from trial counsel and concluded there was "probably no deficiency in researching this issue."  All of the evidence points to the conclusion that prior postconviction counsel simply relied on the sufficiency of trial counsels' investigation, and failed to perform any mitigation investigation of their own.  ROA.12356-57.

### E.    The *Wiggins* claim presented to the district court.

Before the district court Tong argued that "[d]efense counsel provided ineffective assistance of counsel during the punishment phase of Tong's trial, in violation of his right to counsel under the Sixth Amendment to the U.S. Constitution, applicable to the States via the Fourteenth Amendment." ROA.12356.  The familiar standards of *Strickland v. Washington,* 466 U.S. 668 (1984), and detailed briefing was submitted on both prongs of the *Strickland* test.[11]  ROA.12357-71.

Related to the first *Strickland* prong, Tong identified the prevailing professional norms at the time of this trial, and explained how counsel failed to live up to those norms.  ROA.12360-67.  Related to prejudice, Tong noted that the jury's deliberation suggested it was seriously considering the punishment case despite trial counsel's deficient performance.  ROA.12368.  Of course, the evidence which trial counsel failed to investigate and present to the jury was briefed, and Tong explained how this omitted mitigation evidence rebutted the entirety of the prosecution's argument against the mitigation case.  ROA.12368-71.  In its order granting the Director's motion to enter judgment, the district court noted that "Tong presents a

---

[11] (1) counsel's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defendant by depriving him of "a trial whose result is reliable." *Id.* at 687.

serious claim that he received ineffective assistance of counsel during the punishment phase of his trial." ROA.13242.

Because the parties agreed that the *Wiggins* claim was both procedurally defaulted and unexhausted, Tong also filed a motion to stay the district court proceedings to exhaust the claim before the state courts, and argued that he could prove cause and prejudice to overcome the procedural default pursuant to *Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013).[12] Tong argued that he had proven his claim had "some merit," as required by *Trevino,* and briefed in detail that post-conviction counsel had violated firmly established professional norms by failing to conduct their own, independent, mitigation investigation. ROA.1372-12375.

The district court did not reach the merits of these issues.

## SUMMARY OF THE ARGUMENT

Appellant Tong argues that the district court erred by granting the Director's motion to enter judgment and terminate remand for two reasons. First, the district court abused its discretion by failing to grant Tong's motion to stay the federal

---

[12] "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 1921 (citing *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012)).

proceedings so he could present his serious claim of ineffective assistance of trial counsel to the state courts. The Supreme Court has held a district court likely abuses its discretion in failing to grant a motion to stay when a habeas petitioner shows good cause for his failure to exhaust a constitutional claim in state court, the claim is potentially meritorious, and where there is no indication that the petition engaged in intentionally dilatory litigation tactics. Tong established each element before the district court, but the district court held the claim was plainly meritorious because Texas would not address the merits of the claim in a future habeas application. The district court's ruling failed to recognize that the principles of comity and federalism dictate that the state court be allowed the first opportunity to consider the application of their own procedural rules, and failed to consider the application of Texas Code of Criminal Procedure art. 11.071 § 5(a)(3).

## STANDARD OF REVIEW

This Court reviews a district court decision denying a habeas petition on procedural grounds de novo. *Butler v. Cain*, 533 F.3d 314, 316 (5th Cir. 2008). A district court's decision concerning the propriety of a stay and abeyance is reviewed for an abuse of discretion. *See Grace v. Vannoy*, 826 F.3d 813, 820 (5th Cir. 2016) (*discussing Rhines,* 544 U.S. at 279). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of

the evidence." *Perez v. Stephens*, 745 F.3d 174, 177 (5th Cir. 2014) (citation omitted).

## ARGUMENT

### I.    THE DISTRICT COURT ERRED BY GRANTING THE DIRECTOR'S MOTION TO ENTER JUDGMENT.

After the Supreme Court's decision in *Shinn v. Martinez Ramirez*, 142 S. Ct. 1718, 1735 (2022), the Director filed a motion asking the district court to enter judgment and end the remand.  ROA.12251-12262.  The thrust of the motion was that further proceedings were futile on account of *Ramirez*.  Tong responded, noting that he anticipated filing of a motion to stay the proceedings which would permit him to exhaust his claim in the state courts, and argued that "habeas petitioners are constitutionally entitled to effective assistance of counsel during initial review collateral proceedings which are not discretionary and which present the only meaningful opportunity to raise a claim of ineffective assistance of trial counsel."[13]

After Tong filed his Amended *Wiggins* briefing and motion to stay and abet the proceedings,[14] the district court granted the director's motion.

---

[13] Tong argues that this issue was left open by *Coleman,* as noted in *Martinez.  See, infra.*

[14] The district court's order states that "anticipates requesting a stay[,]" but Tong actually filed a motion to stay the proceedings which was terminated by the district court's final judgment.  ROA.12825, 13245.

### A.    The district court abused its discretion by failing to grant Tong's motion to stay and abet.

Federal district courts should not entertain unexhausted claims raised in petition for writs of habeas corpus. *See Rose v. Lundy*, 455 U.S. 509 (1982). This idea is based on the "interests of comity and federalism [which] dictate that state courts must have the first opportunity to decide a petitioner's claims." *Rhines v. Webber*, 544 U.S. 269, 273 (2005). However, this doctrine was established in the era before AEDPA's strict one-year statute of limitations on the filling of federal petitions.  28 U.S.C. § 2244(d).

In *Rhines*, the Supreme Court recognized the difficulty faced by petitioners trying to balance the effect of the exhaustion requirement on one hand with the short statute of limitations on the other. After discussing the goals of AEDPA and the role of habeas corpus in general, the Court decided that it is proper for district courts to stay and abet federal proceedings so that unexhausted claims can be presented to the state courts in limited circumstances.  *Rhines,* 544 at 277. The Court held it was proper to grant a stay when: (1) "the district court determines there [is] good cause for the petitioner's failure to exhaust his claims first in state court" and (2) the unexhausted claims are potentially meritorious, and 3) there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id.* at 278.

Importantly, the Supreme Court also explained "it likely would be an abuse of discretion for a district court to deny a stay . . . if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics. In such circumstances, the district court should stay, rather than dismiss, the mixed petition." *Id.* at 278.

To establish good cause before the district court, Tong argued that the "good cause" standard parallels the "cause" standard from *Martinez/Trevino*. The Supreme Court has identified at least three objective impediments to compliance with a procedural rule, and the third is applicable here: the procedural default was the result of ineffective assistance of counsel, viz., failing to properly preserve a federal constitutional claim for review in state court. *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986).

The Supreme Court has suggested that the "good cause" standard from *Rhines* is more forgiving than the "cause" standard associated with overcoming a procedural default. In dicta, the Supreme Court has stated that "[a] petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court." *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005). More importantly, the only circuit court to consider the issue has

36

decided that "the *Rhines* standard for IAC-based cause is not any more demanding than the cause standard articulated in *Martinez." Blake v. Baker*, 745 F.3d 977, 984 (9th Cir. 2014). For that reason, the petitioner's "showing of state post-conviction IAC satisfies the *Rhines* good cause standard." *Id.*[15]

Before the district court, Tong established ineffective assistance of his post-conviction counsel by proving that counsel failed to conduct an independent mitigation investigation. This was a clear violation of the professional norm that "habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the postconviction investigation. Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case." Guidelines and Standards for Texas Capital Counsel.[16]

The Texas Guidelines, cited above, encapsulate the prevailing professional norms in place at the time of Tong's initial state habeas petition. The State Bar of

---

[15] In *Moncada v. Perry*, No. 319CV00231MMDCLB, 2022 WL 3636467 (D. Nev. Aug. 23, 2022), a district court applied this doctrine, and granted the petitioner's motion to stay, after the Supreme Court's Decision in *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022).

[16] Available at http://www.texasbar.com/Content/NavigationMenu/ForLawyers/Committees/TexasCapitalGuidelines.pdf

Texas, who drafted the 2006 Guidelines, wrote an amicus brief in *Trevino* explaining that the 2006 Guidelines where simply a description of "the duty to investigate for mitigating evidence that was settled and well-established in 1984, when *Strickland* was decided."  Brief of the State Bar of Texas as Amicus Curiae in Support of Neither Party at 13, *Trevino v. Stephens*, 133 S.Ct. 1911 (2013) (No. 11-10189), 2012 WL 6759403.  That amicus brief requested the Supreme Court to recognize the Texas Guidelines as "a statement of the prevailing norms of practice for effective assistance of post-conviction counsel in Texas capital cases" even though the *Trevino* case was decided by the Court of Criminal Appeals on April 4, 2001.  *Id.*  2-9.  The district court did not dispute that Tong had established good cause.  ROA.13238-13244.

Tong also established that his claim was potentially meritorious.  In his briefing before the district court, and as discussed above, Tong proved that his trial counsel failed to sufficiently investigate the mitigation case, although trial counsel were aware of facts which would have prompted a reasonable attorney to investigate further.  Trial counsel waited too long to conduct their investigation, failed to interview relevant witnesses, provided their experts with incomplete information, failed to instruct their experts on the parameters of their employment, and as a result the jury was presented with a woefully incomplete picture of Tong's life.  These

failures severely hampered the defense's mitigation case, and simultaneously prevented a viable defense against the future dangerous special issue. ROA.12298-12371. The district court did not dispute this argument, and noted that "Tong presents a serious claim that he received ineffective assistance of counsel. . ." ROA.13242.

However, the district court based its ruling on the idea that "[a] claim is plainly meritless if it is procedurally defaulted such that the state court will not consider the claim on the merits." ROA.13241. (*citing Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005)). Unlike the *Neville* case, Tong has presented the Court with good cause for his failure to exhaust the *Wiggins* claim, and has argued that Texas can review his claim on the merits. *Neville,* 423 F.3d at 480.

The district court faulted Tong for arguing that Texas might agree to allow merits review in light of *Martinez, Trevino,* and the recent decision in *Ramirez.* The Court held the *Wiggins* claim was plainly meritless because the Court of Criminal Appeals (CCA) "has never held that ineffective assistance of habeas counsel constitutes cause, and this Court will not grant a stay based on Tong's hypothetical hope that the law will change." ROA.13241. However, Tong had argued that that at least six Justices have, at one point or another, suggested that the Court should

revisit its subsequent application jurisprudence in light of *Trevino*.[17]  Indeed, four current Judges of the Court assumed *Martinez* and *Trevino* could have changed their past decisions, and addressed the merits of a state applicants claims in a concurring opinion. *Ex Parte Medina*, No. WR-41,274-05, 2017 WL 690960, at 9 (Tex. Crim. App. 2017).

*Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002), should also be discussed.  The Respondent will likely argue that Texas is not likely to apply *Martinez* or *Trevino* based upon this case, but a reading of *Graves* raises doubts about whether or not it even controls.  Graves did not raise a claim attacking the validity of his conviction.  Instead, the claim at issue there was "based solely upon an alleged violation of the habeas statute itself. It [was] not a constitutional claim." *Id.* at 116.  Of course, "[s]tatutory violations simply are *not* cognizable claims on a writ of habeas corpus." *Id.* at 116-17.  Tong raises a substantial claim of ineffective assistance of counsel at punishment, and only raises the ineffectiveness of his state post-conviction counsel as means to permit merits review of that substantial claim.

---

[17] *Ex parte Alvarez*, 468 S.W.3d 543 (Tex. Crim. App. 2015) (concurrence by Yeary, J., in which Johnson and Newell, JJ., joined.); *Ex parte Buck*, 418 S.W.3d 98 (Tex. Crim. App. 2013) (dissent by Price and Johnson, JJ., joined); *Ex parte McCarthy*, WR-50,360-04, 2013 WL 3283148 (Tex. Crim. App. June 24, 2013) (concurrence by Price, J., and Meyers, J., joined) (dissent by Alcala, J., in which Johnson, J., joins.).

Nor did *Graves* address specific subsection of Texas Code of Criminal Procedure article 11.071 § 5 which permit merits review of successive claims.

A recent decision by the Nevada District Court supports that a stay is proper despite a similar circumstance. That Court addressed the propriety of a post-*Ramirez* stay in *Moncada v. Perry*, No. 319CV00231MMDCLB, 2022 WL 3636467 (D. Nev. Aug. 23, 2022). Like Tong, the petitioner argued that staying his petition "would not be futile" because he could raise various "arguments in state court to excuse the procedural default of his unexhausted claims." *Id.* at 2. The district court found that Moncada had established good cause for his procedural default because "the attorney who handled his state habeas action performed ineffectively by failing to raise these claims" and because the "showing of good cause is not 'a bare allegation of state postconviction [ineffective assistance]. . . .'" *Id.* at 3. The Stay was granted *in spite* of the fact that he "would face several procedural bars if he returned to state court to raise his unexhausted claims." *Id.* at 4. Although Nevada had apparently precluded ineffective assistance of state post-conviction counsel as a reason to forgive a procedural bar, a stay was appropriate because there were other potential avenues for relief and because "the state courts should generally have the first opportunity to consider the application of conclusive procedural bars." *Id.* Tong has made this very argument.

41

The Western District of Louisiana recently made a similar ruling. *See Irish v. Cain*, No. CV 15-480, 2023 WL 2564397 (W.D. La. Mar. 16, 2023). There, the court noted that the *Ramirez* heightened the need for a stay. *Id.* at 2. Like Tong, the court noted that the principles of comity and federalism favor the granting of a stay "unless it is 'entirely clear' that state procedural bars 'would prohibit consideration' of a petitioner's claim. . ." *Id.* at 4 (*citing Wilder v. Cockrell*, 274 F.3d 255, 262-53 (5th Cir. 2001)). For that reason, the court granted the stay "despite concerns bout the procedural issues that Irish may face. . ." *Id.*

The district court also erred by holding that none of Texas Code of Criminal Procedure art. 11.071 § (5)(a)'s exceptions to subsequent applications applied to Tong's case. Tong had explained that if allowed to return to state court he would assert that Section 5(a)(3) of Article 11.071 permits review of his substantial *Wiggins* claim. "Under this provision, a subsequent capital habeas applicant is entitled to a merits-review of a claim if he can show by clear and convincing evidence that, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071[.]" *Ex parte Blue*, 230 S.W.3d 151, 153 (Tex. Crim. App. 2007) (internal quotation marks omitted). To meet this burden, the applicant must "reasonably show" that he can meet the

section 5 (a)(3) requirements. *Id.* at 154. To meet this standard, Tong must only make a "*threshold* showing of evidence that would be at least *sufficient* to support an ultimate conclusion, by clear and convincing evidence, that no rational factfinder" would have sensed him to death. *Id.* at 163. The district court's order failed to discuss this potential ground for relief beyond the conclusory statement that "[n]one of these [§ 5] exceptions applies to this case." ROA.13242.

Finally, Tong has not engaged in intentionally dilatory litigation tactics. Although this case has taken a circuitous path, the delay in this case should not be attributed to Tong, and there is certainly no evidence that he engaged in intentionally dilatory tactics. Substitution of federal habeas counsel was necessary to avoid the conflicts associated with the *Martinez* and *Trevino* decisions. *See* ROA.1509-1512. Undersigned counsel promptly requested funding for a mitigation expert, and renewed this request at each available opportunity anticipating the eventually decision in *Ayestas* which resulted in the current remand. ROA.1786, 1824, 2737. And much of the delay in this case was the result of the prosecution's failure to disclose payments made to potential witnesses and mistreatment of potential witnesses. *See* Application for Additional Certificate of Appealability (discussing the *Brady* claims). The delay in these proceedings is not the result of misconduct on Tong's part, but, instead, the unique nature of this case.

43

Other cases have been stayed in similar circumstances. The Nevada District Court once again granted a stay and abeyance in *Guevara-Pontifes v. Baker*, No. 320CV00652ARTCSD, 2022 WL 4448259 (D. Nev. Sept. 23, 2022). There, the respondents made the same arguments as the director. *Id.* at 1. The petitioner there, like Tong, suggested that the state court might, in light of *Ramirez,* permit the use of the principles set forth in *Martinez* for purposes of overcoming state procedural bars. That Court granted the stay "[a]lthough the Court agrees that Guevara-Pontifes's return to state court is unlikely to result in a determination of the merits of his claims due to the state procedural bars. . ." *Id.* The Court noted that the *Rhines* test does not include consideration of the likelihood of success, so long as the claim is not plainly meritless.

In *Pandeli v. Shinn*, the United States District of Arizona agreed that "alleged ineffective assistance of PCR counsel constitutes good cause under *Rhines*." No. CV-17-01657-PHX-JJT, 2022 WL 16855196, at 5 (D. Ariz. Nov. 10, 2022). The Court went on to note that "[t]he propriety of a stay is magnified by the decision in *Ramirez* and its limitations on the presentation of new evidence in federal habeas court." *Id.*[18]

---

[18] *See also*, *Taylor v. Dir. - Nevada Dep't of Corr.*, No. 220CV01962GMNDJA, 2023 WL 2189062, at *4 (D. Nev.

44

Because Tong "had good cause for his failure to exhaust, his unexhausted claim[ is] potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics" the district court abused its discretion in granting the Director's motion end the remand rather granting Tong's motion to stay the proceedings so that he could exhaust his *Wiggins* claim before the state courts. *Rhines,* 544 U.S. at 278. Tong request that this Court reverse the district court's judgment, and remand for entry of the requested stay and abeyance.

**B.    Habeas petitioners are constitutionally entitled to effective assistance of counsel during initial review collateral proceedings which are not discretionary and which present the only meaningful opportunity to raise a claim of ineffective assistance of trial counsel.**

The Supreme Court has not held that there is a constitutional right to counsel in collateral proceedings. In *Pennsylvania v. Finley*, the Court held that the *Anders* framework was not applicable to post-convictions proceedings, even when the applicant had been provided with counsel. 481 U.S. 551, (1987). There, the Court declined to hold "that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions. . ." *Id.* at 555. In *Murray v. Giarratano*,

---

Feb. 22, 2023) (granting a stay in similar circumstances); *WILLIAM K. SAPP, Petitioner, v. CHARLOTTE JENKINS, Warden, Chillicothe Corr. Inst., Respondent.*, No. 2:17-CV-1069, 2023 WL 3475412, at *2 (S.D. Ohio May 16, 2023) (same).

492 U.S. 1 (1989), a four-judge plurality decided that neither Eighth Amendment nor due process clause requires states to appoint counsel for indigent death row inmates seeking state post-conviction relief.

A potential exception to this rule was noted in *Coleman v. Thompson*, 501 U.S. 722 (1991). In *Coleman,* the Court noted that "counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation[,]" and, relying on *Finley* and *Giarratano*, explained "there is no right to counsel in state collateral proceedings." The Court recognized a possible exception to this rule: Coleman could establish cause and prejudice if there was "an exception to the rule of *Finley* and *Giarratano* in those cases where state collateral review is the first place a prisoner can present a challenge to his conviction." *Id.* However, the Court did not address that issue in *Coleman* "for one state court has addressed Coleman's claims[.]" *Id.* at 755. The default in *Coleman* did not occur during initial-review collateral proceedings, but rather on appeal from those proceedings. *Id.* Unlike, Tong's case, one Court had passed upon the merits of the relevant claims.

This idea, that criminal defendant's should have one counseled attempt to vindicate serious constitutional violations, flows directly from *Douglas v. California*, 372 U.S. 353 (1963), and *Halbert v. Michigan*, 545 U.S. 605 (2005). In *Douglas,* the Court held that the constitutional rights of equal protection and due

46

process required that indigent defendants be appointed counsel *if* States provide for a non-discretionary appeal from State convictions.  The Court was clear that counsel is a constitutional requirement if a defendant has the right to appeal and the appeal will involve issues not previously addressed by any court.  *Id.* at 356 ("We are not here concerned with problems that might arise from the denial of counsel for . . . claims [that] have once been presented by a lawyer and passed upon by an appellate court.").  The Court held that "where the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor."

The defendant in *Halbert*, after being convicted on a plea of nolo contendere, requested that counsel be appointed to represent him in applying for leave to appeal, but the Michigan courts denied that request.  545 U.S. at 609.  The Supreme Court, however, held that the due process and equal protection guarantees of the Fourteenth Amendment required "the appointment of counsel for [Michigan] defendants, convicted on their pleas, who [sought] access to first-tier review" -- even though such review was discretionary. *Id.* at 610. This holding was based on this Court's conclusion that *Douglas* -- rather than *Ross v. Moffitt*, 417 U.S. 600 (1974) -- provided "the controlling instruction." *Id.* at 616-17. That conclusion in turn was based on two factors: (i) "in determining how to dispose of an application for leave

47

to appeal, Michigan's intermediate appellate court looks to the merits of the claims made in the application"; and (ii) "indigent defendants pursuing first-tier review [i.e., their first available opportunity for review] in the Court of Appeals are generally ill equipped to represent themselves," in part because they (unlike the defendant in *Ross*) have no prior briefing by counsel of relevant issues to present to the reviewing court. *Id*. at 617, 618-22. Once again, the Court based this constitutional requirement on the fundamental principles that criminal defendants should have at least one counseled opportunity to challenge constitutional violations underlying their conviction.

In *Martinez v. Ryan*, the Supreme Court explained that the relevant question remained unanswered:

> *Coleman v. Thompson*, *supra,* left open, and the Court of Appeals in this case addressed, a question of constitutional law: whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial. These proceedings can be called, for purposes of this opinion, "initial-review collateral proceedings." *Coleman* had suggested, though without holding, that the Constitution may require States to provide counsel in initial-review collateral proceedings because "in [these] cases ... state collateral review is the first place a prisoner can present a challenge to his conviction." *Id.,* at 755, 111 S.Ct. 2546.

566 U.S. 1, 9 (2012). *Martinez* was "not the case, however, to resolve whether that exception exists as a constitutional matter." *Id*. Despite that this was the question presented in *Martinez,* the Court granted certiorari on the narrower question of

whether ineffective assistance of counsel in initial review collateral proceedings could constitute cause and prejudice when claims of ineffective assistance of trial counsel had been procedurally defaulted.

In light of *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), the question of whether a prisoner has a right to effective counsel in collateral proceedings providing the first meaningful opportunity to raise a claim of ineffective assistance at trial is of utmost importance.  In *Shinn*, the Supreme Court held that "under § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent.  In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements."  *Id.* at 1735.  However, the Court also recognized that a prisoner would not be deemed at fault if his counsel provided "constitutionally ineffective" assistance.  *Id.*[19]  "That is not because a constitutional error 'is so bad that the lawyer ceases to be an agent of the prisoner, but rather because a violation of the right to counsel 'must be seen as

---

[19] *See also Murray v. Carrier*, 477 U.S. 478, 489 (1986):

> Instead, we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.
>
> . . .
>
> Similarly, if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not "conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance." *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). Ineffective assistance of counsel, then, is cause for a procedural default.

49

an external factor' to the prisoner's defense." *Id.* at 1733 (*citing Coleman*, 501 U.S. at 754 (internal quotation marks omitted)). *Shinn* did not address the question of whether ineffective assistance of counsel during initial review collateral proceedings which are not discretionary and which present the only meaningful opportunity to raise an ineffective assistance of counsel claim, violates the Constitution, and any statements on that issue would be dicta.[20]

The legal framework of *Halbert* and *Douglas* directs that there exists a right to counsel during non-discretionary initial review collateral proceedings presenting the only meaningful opportunity to raise a claim of ineffective assistance of trial counsel. This argument is also supported by *Evitts v. Lucey*, 469 U.S. 387 (1985). In *Lucey,* the Supreme Court discussed the line of cases discussed above and decided that a criminal defendant is entitled to effective assistance of counsel on a first appeal as of right. "The two lines of cases mentioned-the cases recognizing the right to counsel on a first appeal as of right and the cases recognizing that the right to counsel at trial includes a right to effective assistance of counsel-are dispositive of respondent's claim." *Id.* at 396. The Court applied the right to counsel because a prisoner was challenging a conviction "with it's consequent drastic loss of liberty,"

---

[20] *See Central Va. Community College v. Katz,* 546 U.S. 356, 363 (2006) (Supreme Court "not bound to follow our dicta in a prior case in which the point now at issue was not fully debated").

the appellate proceeding is adversarial and procedurally complex, unrepresented appellants would be unable to protect their vital interest, and a "party whose counsel is unable to provide effective representation is in no better a position that one who has no counsel at all." *Id.* Each of these rationales applies to capital collateral review proceedings involving ineffective assistance of counsel claims in Texas. A Texas prisoner is attempting to demonstrate that the "drastic loss of liberty" associated with a capital conviction is unlawful, habeas corpus is an adversary proceeding governed by complex procedural rules, and the state mandated requirement of appointed counsel in this circumstance does little if the constitution does not require that appointed counsel to be effective.

Finally, the right to counsel is necessary to ensure that at least one court reviews potentially meritorious ineffective assistance of trial counsel claims. In Texas, a capital petitioner is entitled to appointment of counsel and the filing of a writ of habeas corpus. *See* Tex. C. Crim. Pro. Art. 11.071 sec. 2, 3, 4 (west 2002). Indeed, the filing of an application is mandated by statute, and the Court of Criminal Appeals must review the application. *Id.* at sec. 4, 11. And, Texas's procedural rules "by reason of [their] design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 569 U.S. at 429.

51

The two principles in *Douglas* and *Moffit* apply straightforwardly to this circumstance: (1) the initial state collateral review is the only meaningful chance a Texas capital defendant will have for the review of his ineffective assistance of trial counsel claim, and (2) uncounseled defendants pursuing habeas relief (on ineffectiveness grounds) will be ill equipped to represent themselves.

Tong argues that the District Court's resolution of this claim was erroneous. The district court merely held that "[t]his is simply not the current state of the law and would run contrary to the entire reasoning of *Martinez Ramirez*." ROA.13242. This is incorrect. *Ramirez* presented a question of statutory interpretation: "whether the equitable rule announced in *Martinez* permits a federal court to dispense with § 2254(e)(2)'s narrow limits because a prisoner's state postconviction counsel negligently failed to develop the state-court record." 142 S.Ct. at 1728. Despite various dicta, *Ramirez* did not address the constitutional question at hand, and, therefore, that case has no bearing on the issue, other than to highlight the importance of the constitutional question raised, but not addressed, in *Martinez*.

Tong urges this Court to hold that he was entitled to effective assistance of counsel during his initial-review collateral proceedings which presented the only meaningful opportunity to raise his substantial ineffective assistance of counsel claim, and to hold that the district court erred in ruling otherwise. The Court should

then remand the case so that the district court can consider the existence of cause and prejudice to overcome any procedural default and the merits of the underlying constitutional claim.

## PRAYER FOR RELIEF

Tong requests that this Court reverse the district court's judgment and order granting motion to enter judgment. This Court should reverse the district court's judgment denying his motion to stay the proceedings, and remand to the district court so that the federal proceedings can be stayed while Tong exhausts his *Wiggins* claim in state court. In the alternative, the Court should hold that Tong had a constitutional right to effect assistance of counsel during is initial-review collateral proceedings which provided the first occasion to raise his *Wiggins* claim, and remand his case to the district court for full consideration of that claim.

Respectfully submitted,

/s/ Jonathan David Landers

Jonathan Landers
917 Franklin Suite 300
Houston, TX 77002

Jlanders.law@gmail.com

(713) 685-5000 (work)
(713) 513-5505 (FAX)


COURT-APPOINTED ATTORNEY FOR TONG

## CERTIFICATE OF SERVICE

I certify that a copy of this documents was served on all counsel of record via ECF on the May 22, 2023.


/s/ Jonathan David Landers
Jonathan Landers

## CERTIFICATE OF COMPLIANCE

1.     This brief complies the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,180 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a

proportionally spaced typeface using Microsoft® Office Word 2021 in 14-Point Times New Roman font.

/s/ Jonathan David Landers

Date: May 24, 2023
Jonathan Landers